IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EDDIE C. WILLIAMS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 10 C 6321 |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) Magistrate Judge Morton Denlow ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

Claimant Eddie Williams ("Claimant") brings this action under 42 U.S.C. § 405(g) seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Defendant" or "Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB"). In response, Defendant filed a motion to affirm the Commissioner's decision. Claimant raises the following issues in support of his motion: (1) whether the ALJ appropriately evaluated Claimant's allegations of severe fatigue; and (2) whether the ALJ properly analyzed the evidence of Claimant's spinal degeneration. For the following reasons, the Court denies Claimant's motion, grants the Commissioner's motion, and affirms the decision of the Commissioner.

# I. BACKGROUND FACTS

## A. Procedural History

Claimant initially filed for DIB on July 16, 2008, alleging a disability onset date of January 1, 2004. R. 147–55. Claimant's date last insured for disability insurance benefits was December 31, 2004. R. 29. The Social Security Administration ("SSA") denied his application on September 2, 2008. R. 84–87. Claimant then filed a request for reconsideration, which the SSA denied on January 22, 2009. R. 96–98. Shortly thereafter, Claimant requested a hearing before an ALJ. R. 99–100.

On October 28, 2009, Administrative Law Judge Mona Ahmed (the "ALJ") presided over a hearing at which Claimant appeared with his attorney, Barry Schultz. R. 25–72. Claimant, medical expert Dr. John Cavenagh, and vocational expert Grace Gianforte testified at the hearing. On November 16, 2009, the ALJ rendered a decision finding Claimant not disabled under the Social Security Act. R. 9–24. Specifically, the ALJ found Claimant, through the date he was last insured, did not have an impairment or combination of impairments that significantly limited his ability to perform basic work-related activities for a period of twelve consecutive months. R. 14.

Claimant then requested review of the ALJ's decision by the Appeals Council. R. 145–46. On December 1, 2009 the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. R. 4–8. Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g).

B.   **Hearing Testimony—October 28, 2009**

1.   **Eddie Williams—Claimant**

Claimant was fifty-seven years old as of December 31, 2004, the date he was last insured. R. 29, 64. He worked as a machinist for Caterpillar for thirty years before retiring in 1998. R. 33. Following his time there, he worked as a security guard, and was last employed as a machinist for Midwest Temp Group in 1999. R. 32–33. While at Midwest Temp Group, Claimant's job duties included running an automated machine and loading parts onto the machine that weighed up to forty-five pounds. R. 34–35. Claimant testified he experienced back pain as a result of his work as a machinist, and he quit in part because of the pain and because he was about to be demoted. R. 33, 48–49.

Claimant described various medical impairments he suffered. He began experiencing joint pain as far back as 2003 or 2004, but was not actually treated for arthritis until 2007 or 2008, when the arthritis symptoms "completely demobilized" him. R. 39–40. His arthritis in 2004 was very light, but sometimes made walking painful. R. 45–46. He now takes Plaquenil, which effectively treats his arthritis. R. 40, 45.

Claimant also suffered from various respiratory problems. In October 2004, Claimant told his doctor at a yearly check-up that he suffered from asthma. R. 40. Claimant occasionally uses an inhaler to treat his alleged asthma, but can eliminate most of the symptoms by wearing a dust or paint mask, or avoiding the outdoors. R. 41. Claimant also suffered from nasal polyps for most of his life, which required him to breathe through his mouth at times. R. 42–43. As a result of the polyps, Claimant could

not breathe through his nose at night, which led to poor sleep. R. 43. Claimant treated the polyps with Afrin, but fixed the problem with nasal surgery in 2006. R. 43–44.

Lastly, Claimant described his functional capabilities. At the time of the hearing, Claimant frequently drove himself, went on walks, and generally tried to move every day. R. 31. In 2004, Claimant lived alone and would do all the work around the house, including cutting the grass, painting the house, and keeping up with the house. R. 38. He would also play golf in the summers, although he described summers as his "best days" when his medical problems would not affect him as much. *Id.* Claimant was also doing odd jobs, such as cutting hair, installing hardwood floors, and helping to build sheds. R. 35–36. When performing these jobs, however, he could only work for two to four days, before his fatigue forced him to take time off. R. 36, 48. Claimant generally described his energy level as low beginning in 2004. R. 47. This low energy level resulted in Claimant not going to the gym as much as he used to when he was younger, although he admits that taking some vitamins partially increased his energy level. R. 48.

### 2. Dr. John Cavenagh—Medical Expert

Dr. John Cavenagh, who practices internal medicine, testified as a medical expert. R. 49–61, 144. After reviewing the medical exhibits and listening to Claimant's testimony, the ME found no objective medical evidence for significant functional impairments that existed in 2004 or earlier. R. 50–51. The ME examined medical evidence from the period when Claimant was last insured as well as more recent evidence. R. 49–61.

The ME first reviewed the medical evidence relating to Claimant's breathing problems. In January 2003, Claimant was diagnosed with bronchitis and benign prostatic hypertrophy. R. 50. Later in October 2004, Claimant complained of asthma and requested an inhaler. R. 51. In December 2005, emergency room doctors diagnosed Claimant with extreme nasal polyps with chronic sinusitis, and doctors performed surgery on those polyps one month later. *Id.*

The ME opined that Claimant's asthma did not appear limiting because there was no medical evidence—either in the form of emergency room visits or hospitalizations—for asthma. R. 51–52. In regards to the nasal polyps, the ME noted that while they were not diagnosed until 2006, it is reasonably certain they could have existed in 2004. R. 53. But without evidence that the polyps caused oxygen deficiency, the ME opined they would not limit Claimant's ability to perform normal activity. R. 54–55. While uncomfortable, the polyps did not prevent Claimant from breathing through his mouth. *Id.*

The ME then addressed Claimant's arthritis and back impairments. The ME noted that doctors did not diagnose Claimant with rheumatoid arthritis until May 2008, and that he could not say with reasonable medical certainty that Claimant suffered from the condition in 2004. R. 52–53. Claimant did exhibit moderate degeneration in his cervical and lumbar spine on a June 2006 x-ray. R. 58, 60. The ME testified that these changes were most likely permanent post-operative changes from Claimant's 1989 fusion surgery of the cervical spine, and therefore Claimant probably had the same medical impairments

in 2004. R. 59. The ME said there was no way to know if these impairments were causing symptoms in 2004. R. 60. He also noted, it turns out incorrectly, that the record lacked evidence that the condition had caused pressure on the spinal cord or nerves coming out of the spinal cord. *Id.* He did note some disc space narrowing, which could impair full range of motion, but examination notes did not reflect decreased range of motion. R. 60–61. On questioning by Claimant's attorney, the ME stated that if Claimant avoided engaging in strenuous activity, he might not have experienced significant symptoms from the arthritic condition of his back. R. 61.

The ME also discussed Claimant's heart health. In August 2005, doctors performed a cardiac stress test on Claimant. R. 51. Test results showed cardiac function was normal, but indicated a possible old myocardial infarction at one time. *Id.* Doctors found a tortuous aorta in August 2005, but this condition by itself does not cause symptoms or functional impairments. R. 55.

Finally, the ME described several blood test results that showed Claimant had "high normal" red blood cell counts. R. 56. The ME opined that Claimant's elevated red blood cell levels would not likely cause limiting symptoms. R. 57. He also noted that while Claimant may have a tendency to polycythemia, Claimant "never quite reached that level that the clinicians made that diagnosis." R. 56.

### 3. Grace Gianforte—Vocational Expert

Grace Gianforte testified as a vocational expert, though her testimony is not presently at issue. R. 62–71, 142. The VE described the jobs Claimant held in the last

fifteen years, the skills he acquired from those positions, and whether these skills would transfer to light or sedentary work. R. 63–64. She then answered a series of hypothetical questions concerning the ability to work of people having Claimant's age and skill level, with various functional constraints. R. 64–71.

## C.    Medical Evidence

### 1.    Rheumatoid Arthritis

Claimant's treatment for rheumatoid arthritis began in April 2008 when Claimant visited a rheumatology specialist about inflammation of his joints. R. 219. X-rays of Claimant's hands showed mild degenerative changes and x-rays of his hips revealed no problems. R. 213–14. Doctors diagnosed Claimant with rheumatoid arthritis and prescribed him Plaquenil in May 2008. R. 219.

### 2.    Back Impairment

Claimant has a history of cervical and lumbar degeneration. In June 2006 at an annual checkup, Claimant complained of radiating pain in his left arm and right flank for a period of one month. R. 312. X-rays of Claimant's cervical spine at that time showed moderate cervical spondylosis. R. 307. The x-ray report noted post-surgical fusion of C4 and C5 vertebral bodies and mild to moderate encroachment on various parts of the cervical spine, and advised clinical correlation. *Id.* X-rays of the lumbar spine showed mild to moderate lumbar spondylosis and mild disc space narrowing and some mild facet arthritis in the lumbar spine. *Id.* At a follow-up visit a month later, Claimant's family doctor diagnosed him with neck and lower back pain, and instructed him on proper exercise, but prescribed him no medications. R. 305.

### 3. Blood Tests

Several blood tests recorded an elevated red blood cell count and a low mean corpuscular volume. These tests date from January 2003, October 2004, June 2005, July 2005, June 2006, August 2007, March 2008, and August 2008. R. 272, 290, 303, 306, 329, 331, 336, 340. One lab report from Quest Diagnostic interpreted the results as "possible alpha thalassemia trait, rule out iron deficiency anemia" in July 2005, but none of Claimant's treating doctors diagnosed either condition. R. 329.

### 4. Fatigue

Claimant reported fatigue to his doctors on at least two occasions, commencing in 2008. In August 2008, Claimant reported to his family doctor at a check-up that he was suffering from fatigue. R. 270–71. In February 2009, Claimant again complained to his family doctor about loss of energy and fatigue. R. 235–36.

### 5. Nasal Polyps and Asthma

Claimant was diagnosed with nasal polyps in December 2005. R. 354. According to his patient history, Claimant had a long-standing history of nasal polyps which progressively worsened. *Id.* Doctors prescribed Claimant prednisone and scheduled him for a polypectomy and functional endoscopic sinus surgery. R. 353. Claimant underwent a successful surgery in February 2006 and he presented with no problems at follow-up visits. R. 341–44.

Claimant also has some history of respiratory problems. In his patient history on October 2004, Claimant's family doctor noted that Claimant gets short of breath "[e]very

once in a while . . . walking up stairs." R. 318. Claimant also has a history of smoking. R. 318. He requested an inhaler for asthma on multiple occasions, and was given one on June 2005. R. 317. That said, his doctor noted that Claimant's problems were "probably from smoking." *Id.* He was diagnosed with bronchitis versus pneumonia and COPD, but not asthma. *Id.* In January 2006, a chest x-ray noted no acute lung disease. R. 315.

**D.     The ALJ's Decision—November 16, 2009**

After a hearing and review of the medical evidence, the ALJ determined that Claimant was not disabled under the Social Security Act. R. 9-21. The ALJ evaluated Claimant's application under the required five-step sequential analysis. At step one, the ALJ found Claimant had not engaged in substantial gainful activity from the alleged onset date of January 1, 2004 through the date last insured of December 31, 2004. R. 14.

At step two, the ALJ first determined Claimant had several medically determinable impairments: gastro-esophageal reflux disease, benign prostatic hypertrophy, possible asthma, nasal polyps, and likely degenerative disc disease or spondylosis in the cervical and lumbar spine. *Id.* Nevertheless, the ALJ concluded that none of these impairments were severe because they did not significantly limit Claimant's ability to perform basic work-related activities for twelve consecutive months through the date last insured. *Id.*

In reaching this decision, the ALJ found that Claimant's medically determinable impairments could have reasonably been expected to produce some of his symptoms of pain and fatigue, but that his statements concerning the intensity, persistence, and limiting effects of these symptoms were inconsistent with the medical evidence. R. 16. The ALJ

relied on the ME's opinion in finding that Claimant's various medically determinable impairments did not produce limiting effects during the insured period. R. 17–19. Because Claimant lacked a severe impairment, the ALJ concluded that Claimant was not disabled between January 1 and December 31, 2004. R. 21.

## II. LEGAL STANDARDS

### A. Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000). Under such circumstances, the district court has jurisdiction to review the ALJ's decision. *Id*. Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The ALJ need not address every piece of evidence or testimony presented, but rather must provide a "logical bridge" between the evidence and the ALJ's conclusions, so that a court can assess the agency findings and afford the claimant meaningful judicial review. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). If the Commissioner's

decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports the findings. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**B.  Disability Standard**

Disability insurance benefits are available to a claimant who can establish he is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739–40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C.

§ 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

Social security regulations prescribe a five-step sequential analysis for evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i–v). Under this approach, the ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven he cannot continue his past relevant work due to physical limitations, the burden shifts to the ALJ to show that other jobs exist in the economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

### III. DISCUSSION

To be entitled to benefits, Claimant must show he was disabled as of December 31, 2004, the date he was last insured. The record contains little medical evidence from the relevant period, so the ALJ was left to draw inferences from later medical records and testimony from Claimant and the ME. Given what she had to work with, the ALJ's decision was well-reasoned and properly considered all of the record evidence. She reviewed the medical and other evidence in detail and individually analyzed each of Claimant's many alleged medical problems. She effectively addressed both favorable and contrary evidence regarding Claimant's symptoms, and articulated why the evidence as a

whole supported an adverse finding at step two.  The Court cannot say that the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review."  *Hopgood ex. rel L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (*quoting Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

Nevertheless, Claimant raises two issues in support of his motion: (1) whether the ALJ appropriately evaluated Claimant's allegations of severe fatigue; and (2) whether the ALJ properly analyzed the evidence of Claimant's spinal degeneration.  As explained below, the ALJ adequately considered both points, and substantial evidence supports her conclusions.

A. **The ALJ Properly Found Claimant Did Not Have a Severe Impairment That Caused Fatigue.**

At step two of the disability analysis, the ALJ must determine whether a claimant has a severe impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  To determine whether a claimant's impairment is severe, an ALJ must determine whether the impairment "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c); SSR 96-3p, 1996 WL 374181 (July 2, 1996).  The ALJ must evaluate a claimant's subjective symptoms of pain and fatigue in a two-step process by first looking at medically determinable impairments that may reasonably cause the symptoms, and then considering whether those symptoms could reasonably be expected to cause limitations.  SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).  "No symptom or combination of symptoms can be the basis for a finding of disability . . .

unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms." *Id.* at *1.

Claimant alleges two problems with the ALJ's analysis concerning his alleged fatigue. First, Claimant argues that the ALJ did not properly consider Claimant's elevated red blood cell count in conjunction with his low mean corpuscular volume. Second, he argues that the ALJ did not properly discuss whether Claimant's nasal polyps could have caused sleep apnea that in turn resulted in fatigue. Neither issue provides grounds for overturning the ALJ's decision.

First, the ALJ adequately considered Claimant's abnormal blood results. At the hearing, the ALJ and Claimant's attorney questioned the ME on Claimant's elevated red blood cell count. R. 55–57. According to the ME, Claimant had a high-normal red blood cell count and a tendency to polycythemia, but the count never reached a level where Claimant's doctors diagnosed the condition. R. 56. The ME opined that Claimant's red blood cell count was not high enough to cause limiting symptoms, and the ALJ relied on this opinion in finding that the abnormal laboratory values would not limit Claimant's ability to do basic work activities. R. 19, 57.

Claimant now argues that the ME missed that the laboratory results showed not only a high-normal red blood cell count but also a low mean corpuscular volume, which together could indicate a medical condition that caused fatigue. As further evidence of this theory, Claimant points to a laboratory report by Quest Diagnostics which notes

"possible alpha thalassemia trait, rule out iron deficiency anemia." R. 329. According to Claimant's independent research, these conditions could have explained his fatigue. But even assuming that is true, the ALJ was not required to discuss these two conditions. While an ALJ must not "ignore an entire line of evidence that is contrary to the ruling," she does not need to "discuss every piece of evidence in the record." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). Here, the ALJ addressed Claimant's abnormal laboratory values, questioned the ME about the symptoms and limiting factors associated with them, and found that Claimant's abnormal laboratory values would not cause any limiting factors. The ME noted that Claimant's elevated red blood cell count had a tendency to polycythemia, but never rose to that level. R. 56–57. No doctor ever diagnosed Claimant with alpha thalassemia trait or iron deficiency anemia, and the ALJ was not required to comb through the record and discuss a *possible* diagnosis listed on a single lab report, especially absent a diagnosis from any physician.

Next, the ALJ properly found Claimant's nasal polyps did not cause limiting symptoms. The ALJ did find that Claimant had nasal polyps in 2004. R. 14. Claimant did not complain of the nasal polyps until December 2005, but relying on the ME's testimony the ALJ found with reasonable certainty that the nasal polyps existed in December 2004. R. 17–18. Again relying on the ME's testimony, the ALJ found that the polyps did not create any functional limitations, because Claimant could still breath through his mouth. R. 18.

Claimant argues the ME overlooked that nasal polyps can cause sleep apnea, but no doctor found Claimant had sleep apnea caused by nasal polyps. Claimant points to a sleep study in 2008 where doctors diagnosed Claimant with obstructive sleep apnea. R. 265–68. This study, however, was performed after the 2006 surgery that fixed Claimant's nasal polyps, and nearly four years after Claimant's date last insured. The ALJ reviewed the medical evidence of Claimant's nasal polyps, and properly relied on the ME's uncontradicted opinion that the nasal polyps were not a cause of fatigue as of December 2004.

The ALJ properly considered Claimant's allegations of fatigue in light of his abnormal laboratory results and nasal polyps. In analyzing Claimant's subjective complaints of fatigue, the ALJ must first consider whether an objectively demonstrated medical impairment could reasonably cause the symptoms and then determine the limiting effects of those symptoms. *See* SSR 96-7p, 1996 WL 374186, at *2. The ALJ validly found that neither Claimant's lab values nor his nasal polyps would cause any symptoms that could limit his basic work activities. R. 18–19. Having found no medically determinable impairment that could cause fatigue, the ALJ was correct to discount Claimant's allegations of fatigue.

**B.  The ALJ Properly Found Claimant's Spinal Degeneration Was Not a Severe Impairment.**

Also at step two, the ALJ determined that Claimant likely had the medically determinable impairment of "degenerative disc disease or spondylosis in the cervical and

lumbar spine." R. 14. Although medical evidence showed spinal degeneration only as of June 2006, the ALJ found Claimant likely suffered spinal degeneration of the same type in 2004. R. 18–19. Despite this, the ALJ also found that the condition was not symptomatic or limiting as of the date last insured. *Id.*

Claimant purports to identify several problems with the ALJ's finding that Claimant's back impairment was not severe. First, Claimant argues that the ALJ improperly "played doctor" by looking past the ME's apparent mistake in interpreting an x-ray. An ALJ may not reach independent medical conclusions unsupported by medical evidence in the record. *See Myles v. Astrue*, 582 F.3d 672, 677–78 (7th Cir. 2009). Here, the ALJ did not "play doctor." Rather, she reasonably explained that the ME's opinion had grounding independent from his mistaken observation that an x-ray showed no encroachment on the foramina. Namely, the ME also observed that the record lacked clinical findings of an impaired range of motion. Besides, the ALJ supported her finding with more than just the ME's opinion. In finding Claimant's spinal degeneration did not cause limiting symptoms by December 2004, the ALJ also based her analysis on the medical records, including the lack of clinical correlation that the x-ray report itself advised; the absence of complaints to doctors about back pain; and Claimant's complaints of left arm pain that began only in June 2006 and precipitated the relevant x-rays. R. 18–19. By acknowledging the ME's possible mistake and logically explaining why it did not change her finding, the ALJ strengthened her conclusion. *See Myles*, 582 F.3d at 678 (criticizing the ALJ for "impermissibly analyz[ing] only the evidence in [the] treating

physician's report which supported his ultimate conclusion while ignoring evidence that undermined it"). The ALJ's finding that Claimant's spinal degeneration was not a severe impairment was supported by substantial evidence.

Next, Claimant argues that the ALJ came to the wrong conclusion about Claimant's lack of treatment for back pain in 2004. Although a lack of treatment may undercut a claimant's credibility, the ALJ must not draw negative inferences from a lack of treatment before exploring the claimant's explanation for it. SSR 96-7p, 1996 WL 374186, at *7. For instance, "daily activities may be structured so as to minimize symptoms to a tolerable level." *Id.* at *8. Contrary to Claimant's assertion, the ALJ dealt with this issue fairly and thoroughly, even if she did not reach the conclusion Claimant desires. Claimant did not complain to a doctor about back or other joint problems until well after his date last insured. Although Claimant insists that he modified his activities to minimize pain, the ALJ noted that Claimant had engaged in some strenuous activity, such as painting, cutting grass, and installing wood floors. R. 19–20. Claimant's failure to report his earnings from odd jobs prevented any chance at correlating his work history with the alleged onset date, but that was not the ALJ's fault. Claimant also stresses the ME's testimony that if Claimant were not engaging in strenuous activity, he might not have experienced significant symptoms from his back condition. The ALJ acknowledged this testimony but found it too speculative to say that Claimant would have experienced limiting symptoms had he engaged in more strenuous activity. R. 19. This was an understandable conclusion, given the dearth of evidence about Claimant's activities in 2004.

Ultimately, there was nothing remarkable about the ALJ's conclusion. She fairly weighed the available evidence and logically explained her findings. To overturn the ALJ's decision would require re-weighing the evidence, which is not for this Court to do.

## IV. CONCLUSION

**For the reasons set forth in this opinion, the Court denies Claimant's motion for summary judgment, grants Defendant's motion to affirm the Commissioner's decision, and affirms the Commissioner's decision.**

**SO ORDERED THIS 19th DAY OF MAY, 2011.**

_____
**MORTON DENLOW
UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

Barry A. Schultz
Cody Marvin
The Law Offices of Barry A. Schultz, P.C.
1601 Sherman Avenue, Suite 510
Evanston, IL 60201

Counsel for Plaintiff

Abigail L. Peluso
Assistant United States Attorney
United States Attorney's Office (NDIL)
219 South Dearborn Street
Suite 500
Chicago, IL 60604

Cynthia A. Freburg
Assistant Regional Counsel
Social Security Administration
200 W. Adams, Suite 3000
Chicago, IL 60606

Counsel for Defendant